IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| BILLY C., SR., on behalf of B.D.C. II, a minor,<br>          Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>          Defendant. | Case No. 1:18-cv-01431-JES-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 13) and the Commissioner's Motion for Summary Affirmance (Doc. 16). This matter has been referred for a Report and Recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be granted, the Defendant's Motion for Summary Affirmance be denied, and the matter be remanded.[1]

**I**

Plaintiff Billy C., Sr. originally applied for supplemental security income (SSI) on behalf of his son on January 23, 2014. Billy claimed B.D.C. II became disabled on November 25, 2013 due to Attention Deficit Hyperactive Disorder (ADHD) and Oppositional Defiance Disorder (ODD). AR 307. His claim was denied initially on April 29, 2014 and upon reconsideration on May 6, 2015. After Billy requested a hearing, one was held before the Honorable David Thompson

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 9) on the docket.

(ALJ) on November 3, 2016, and Billy as well as B.D.C testified. The ALJ issued an unfavorable decision and Billy sought review of that decision by the Appeals Council (AC). On October 25, 2017, the AC ordered the case be remanded back to the ALJ so he could re-evaluate B.D.C.'s Individualized Education Plan from 2016 and continue with the childhood sequential evaluation process as set forth in 20 C.F.R. § 416.924a.

The ALJ held a new hearing on March 8, 2018 and only Billy testified. The same ALJ issued another unfavorable Decision on June 27, 2018. The AC denied review of that Decision. The AC explained, "We found no reason under our rules to review the [ALJ's] decision. Therefore, we have denied your request for review." AR 1. The ALJ addressed the additional evidence Billy submitted which included a Student Disciplinary Report from Peoria District 150 (disciplinary report or report), dated October 25, 2012 through February 21, 2017 and prescription records from CVS Pharmacy dated August 11, 2018. With regard to the former, the AC said, "We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence." AR 2. With regard to the latter, the AC noted the ALJ decided the case through June 27, 2018 and said, "This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before June 27, 2018." *Id*. Billy filed the instant civil action seeking review of the ALJ's June 27, 2018 Decision on November 29, 2018.

## II

At the first hearing on November 3, 2016, B.D.C., the claimant, was 10 years old, was in fifth grade, and lived with his parents and older brother. He did not like school because his dad was not there with him. He did not know what grades he was getting. He did not have friends at school but did in his neighborhood.

They played games with each other. B.D.C. played video games which he said he could play "all day." AR 88.

Billy, the claimant's father, next testified. He explained B.D.C. was in all special education classes. As for other programs at school in which B.D.C. was enrolled, Billy said B.D.C. had four teachers helping him. "They got him going to a whole bunch of people, try and keep him controlled. Because he gets out of pocket. And he'll go AWOL so much from his school, he'll take off running, that they even have a person to keep up with him to catch him and bring him back to the school." AR 90-91.

Upon questioning by the claimant's attorney, Billy testified that B.D.C. received help with dressing and bathing, and "mostly everything." AR 92. Billy clarified that B.D.C. had only one friend and he otherwise had no friends. The ALJ interjected to ask whether B.D.C.'s parents were given any referrals to psychologists or psychiatrists. Billy answered, "[H]e still gets them. But they said by him being his age, they don't – it's hard to get him a psychologist." AR 94. Billy proceeded to state that B.D.C. talked about dead people since he was three or four years old, still continued to do so, and fed and talked to a dead girl. Billy said that someone would have to be there with B.D.C. to make him do any chores he was given.

At the second hearing on March 8, 2018, the claimant's attorney asked Billy to provide a summary of what had been going on with B.D.C. since the last hearing. Billy testified that he received:

> multiple, multiple phone calls from his school, and his teachers, his caseworker telling me about things he doing acting out at school such as putting belts around his neck like he fixing to hang hisself or playing like he fixing to shoot somebody with his finger like he a police officer.

3

AR 45. He said he started going to the school to see what was going on. He learned B.D.C. was put in a "holding cell" when he acted out, and Billy learned B.D.C. was put in there more than he was in class learning. AR 45. Billy said B.D.C. was in sixth grade but his mind was at the level of a second or third grader. Billy went to the school Monday, Wednesday, and Friday of each week and he sat with his son "almost majority of the day being with him to make sure I keep up with him. Because he got to the point where he was running away from the school." AR 46. He said the school wanted him to be there because B.D.C. acted "a little way half decent" with only his father. *Id*. Billy elaborated that B.D.C.'s incidents while Billy was at school with him "cut down . . . a lot," "[b]ut at the same time, he'll still act out." AR 48. Billy continued, "It depends on what triggers him. It's like if something triggers him, he can just go from zero to 100 instantly. And he can become violent." *Id*. Billy attempted to calm B.D.C. down at those times.

    Billy answered that B.D.C. remained in special education with four or five other students, and he had a caseworker, a teacher, two more people "to keep up with him," and a police officer there with him too. AR 47. There were about three adults, excluding Billy, in B.D.C.'s classroom at all times. Billy said that he obtained insight into B.D.C.'s ADHD problems so he would "know how to deal with [his son]." AR 49. He also explained that the school provided B.D.C. with a woman who helped students who acted out. Billy said the woman did help B.D.C. "a lot." AR 50. Billy also testified as to the effect B.D.C.'s medication had on him. Billy said B.D.C. was "kind of really in a daze with it" and that it slowed him down "so much" that he was "barely here." *Id*. He commented further that his son had to keep taking his medicine until he became used to it.

Upon questioning by the ALJ, Billy testified that B.D.C.'s only medication was methylphenidate[2], 20 milligrams (mg) twice per day. Billy thought B.D.C. had been taking that medication and dose for about eight or nine months. He said B.D.C.'s energy level went all the way down on it to where he barely did anything. The ALJ asked "no violent conduct or anything while he's on the medication?" AR 52. Billy responded, "No, he is – it's like he's not here sometime." *Id*. The ALJ stated he was confused by Billy's testimony as he testified B.D.C. was violent and acted out but also told the ALJ B.D.C. was very docile, his energy was way down, and he "just kind of [sat] there." *Id*. Billy responded:

> Okay. It's like, okay, let's say, like, right now he on the medication. He's like, you see how he acting now. He's docile. He's relaxed. But right now, it could be a child or something – or anything, any incident could trigger. Like I said, he can go from zero to 100. So it's like, even though he be on the medication, I can keep him calm, it's not a constant thing. He can go zero from 100. I mean, it's that all he got to do is be something that "p" him off. Anything could "p" him off. Once he p'd off [snaps] he going to react. It doesn't matter how much medicine he have.

AR 53.

The ALJ next asked Billy about B.D.C.'s grades. Billy confirmed his son received "pretty good grades" – As, Bs, Cs, Ds. AR 54. He also confirmed his son was never arrested. A police officer was in B.D.C.'s classroom every day. His son was suspended from school just the last week before the hearing because B.D.C. stole some school property. Billy had B.D.C. in no other programs through the

---

[2] Methylphenidate hydrochloride: "a central stimulant used in the treatment of attention-deficit/hyperactivity disorder, narcolepsy, and certain forms of depression associated with medical conditions which would preclude treatment with conventional antidepressants; administered orally. DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100066006 (last visited Oct. 25, 2019). "Methylphenidate is a central nervous system stimulant. It affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control." DRUGS.COM, https://www.drugs.com/methylphenidate.html (last visited Oct. 25, 2019).

5

doctor or community. B.D.C. regularly saw a psychiatrist at his school. His ADHD medication was prescribed by B.D.C.'s doctor, Sarah R. Koscica, M.D. at Heartland Clinic. B.D.C. had appointments at Heartland Clinic every month or month and a half to get his medications refilled. At his appointments, B.D.C. was given examinations for the medical provider to "study up on him, see as how he [was] doing." AR 61. His blood, weight, height, blood pressure, attitude, and "everything" were checked at those times. *Id*.

### III

### A

There is a three-step process used to decide whether a child is disabled. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003). First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If not, the ALJ must next determine whether the claimant has a medically determinable impairment that is "severe" or combination of impairments that are "severe." *Id*. If the claimant does have an impairment or combination of impairments that are "severe," the ALJ next must finally determine whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of a listing or that functionally equals the listing. *Id*. To find that an impairment functionally equals a listing, the ALJ must assess the claimant's functioning in terms of six domains: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself; and 6) health and physical well-being. 20 C.F.R. § 416.926a. To functionally equal the listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id*.

**B**

In his June 27, 2018 Decision in this case, the ALJ determined B.D.C. had the following severe impairments: ADHD and ODD. AR 18. The ALJ next determined that B.D.C. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. The ALJ accordingly then considered whether B.D.C. had an impairment or combination of impairments that functionally equaled the severity of the listings. He explained he considered "all of the relevant evidence" which included objective medical evidence and other relevant evidence from medical sources; information from other sources such as school teachers, family members, or friends; the claimant's statements, including statements from his parent(s) or other caregivers; and any other relevant evidence in the case record, including how the claimant functioned over time and in all settings (i.e., at home, at school, and in the community). The ALJ initially gave "limited weight" to Billy's third party statements as to B.D.C.'s symptoms and limitations because Billy was not an acceptable medical source, had a personal interest in aiding his son, and his more extreme allegations of his son's need for constant supervision and hallucinations were not corroborated by the objective record.

As for his discussion of the evidence, the ALJ detailed Billy's and B.D.C.'s testimony at both hearings, two Child Function Reports prepared by Billy on behalf of his son, B.D.C.'s medical records, B.D.C.'s medication regimen, an April 2014 psychological consultative examination, an October 2016 Individualized Education Plan (IEP), an April 2014 State Agency medical consultant's findings, and a May 2015 State Agency medical consultant's findings. Before addressing each of the six functional domains, the ALJ stated:

> In terms of the claimant's alleged [ADHD] and [ODD], the totality of
> the longitudinal evidence of record does not demonstrate a loss of

7

mental functioning greater than those limitations found within this decision. The medical records shows [sic] the claimant's impairments generally well controlled with medication compliance and adequate medication monitoring.

AR 21. Upon his consideration of the six functional domains, the ALJ determined B.D.C. had marked limitation only in the domain of attending and completing tasks.

In reaching his findings as to the extent of limitation B.D.C. had in each of the six functional domains, the ALJ considered Patricia Annette Belcher's (B.D.C.'s special education teacher) March 11, 2015 Teacher Questionnaire, Kristen Joseph's (B.D.C.'s school social worker) September 28, 2015 Teacher Questionnaire, B.D.C's standardized testing performance and his performance on other testing, B.D.C.'s grades throughout the period under consideration, and his education records detailing behavioral problems from 2014 and 2015 and late September 2016.

With regard to the first domain of acquiring and using information, Belcher provided that B.D.C. had a "very serious problem" with more than half the activities in that domain. Joseph opined B.D.C. had a "very serious problem" in all the activities related to that domain. The ALJ gave their opinions "little weight." AR 24. The ALJ further found the medical records did not support Belcher's and Joseph's opinions.

The ALJ also determined B.D.C.'s diagnostic test scores and academic records did not demonstrate a marked limitation in that first domain. The ALJ found:

> the totality of the claimant's diagnostic test scores and academic records do not demonstrate a marked limitation in the ability to acquire and use information. Second, a close look at the claimant's treatment notes in late 2014 and 2015 . . . show the claimant "much improved – able to sit longer and pay attention in class" on Methylphenidate (10 mg., twice daily) []; and that his teachers

> thought things were "going well as long as he is on medication, when off very emotional, hyper and angry."[3]

AR 25 (*quoting* AR 458, 508). The ALJ stated with regard to State Agency Dr. Glen Pittman's analysis:

> A primary factor in [his] analysis [] was the increased ability to sit longer and pay better attention after being put on Ritalin (also known as Methylphenidate)." Dr. Pittman also noted the recommendation of the school counselor of a larger dose (20 mg.) which the counselor must have surmised would have results in even more ability to sit still and pay attention.

*Id*. (*citing* Exhibit 3A, AR 107-15). At the end of his analysis of the first functional domain of acquiring and using information, the ALJ repeated the January 2018 progress note which documented B.D.C.'s then-current medication regimen of 20 mg methylphenidate twice daily, his parents' report that his behaviors were much improved with that medication, and that B.D.C. reported he was doing well in his classes.

In support of his finding of less than marked limitation in the third domain of interacting and relating with others, the ALJ pointed out that B.D.C.'s October 2016 IEP stated he showed significant behavioral difficulties in the first 29 days of school. The ALJ then proceeded to repeat, again, July 2017 and January 2018 treatment notes which included B.D.C.'s parents' reports that his behavior was improved on medication.

The ALJ found no limitation in the fourth domain of moving about and manipulating objects. In support of his less than marked finding in the fifth domain of the ability to care for yourself, the ALJ cited the fact that medical treatment records did not document any significant injuries or exposures to

---

[3] The ALJ attributed that observation to B.D.C.'s teachers where the treatment note in fact attributed that observation to B.D.C.'s parents. *See* AR 508.

personal harm due to diminished mental functioning caused by his impairments. The ALJ gave "limited weight" to Belcher's opinion that B.D.C. had a very serious problem with regulating and responding to his emotions and demands of his daily environment and making good judgments about his personal safety; the ALJ said, "despite the extreme assertions, [Belcher] did not provide examples of such behavior of questionable judgment." AR 30. The ALJ noted Joseph's opinion that B.D.C. did not have serious problems caring for his physical or hygienic needs or cooperating in taking his medications, but B.D.C. did show a serious problem in coping and responding to his emotions, knowing to ask for help, etcetera, and a "very serious" problem in using good judgment in a dangerous situation. AR 31. The ALJ did not explain the weight given Joseph's opinion in that regard. The ALJ found no limitation in the sixth domain of health and physical well-being.

The medical/treatment records upon which the ALJ relied provided the following:

- The ALJ pointed out that B.D.C. started taking methylphenidate in the latter part of 2013. AR 21 (*citing* AR 447).
- In July 2014, B.D.C.'s ADHD was noted as "mild," the problem was "worse," the problem occurred daily, and B.D.C.'s methylphenidate was increased to twice daily and his mother stated his behavior was better. AR 22 (*citing* AR 460).
- In December 2014 while B.D.C. was on methylphenidate 10 mg twice daily, his teacher and parents commented he was "much improved" "but school psychiatrist recommends larger dose." The doctor increased B.D.C.'s methylphenidate dose to 20 mg. AR 22 (*citing* AR 458).

- In June 2015, B.D.C.'s parents thought things were "going well as long as he is on medication, when off very emotional, hyper and angry." His teacher commented things were "going well." AR 22 (*citing* AR 508).[4]
- In May 2016, Billy reported B.D.C.'s methylphenidate dosage increased from 10 mg to 20 mg. AR 22 (*citing* AR 369).
- At the time of B.D.C.'s December 2016 hearing he took 25 mg of Ritalin (methylphenidate). AR 25 (*citing* AR 373).
- In July 2017, Billy stated "the medication helped [B.D.C.] in school" and "this past year [B.D.C.] did really well in school with no incidents." AR 23 (*citing* AR 557).
- In August 2017, Billy stated "[B.D.C.] has calmed down on the medication." AR 23 (*citing* AR 574).
- In January 2018, B.D.C. remained on 20 mg of methylphenidate twice daily, "His parents report that his behaviors are much improved with this medication . . . Patient reports he is doing well in his classes but does have difficulty getting along with other kids at school." AR 23 (*citing* AR 587).
- At the time of B.D.C.'s March 2018 hearing he took 20 mg of methylphenidate twice per day. AR 25.

## IV

Billy makes four arguments: 1) the ALJ's functional equivalence analysis is not supported by substantial evidence because he failed to properly weigh the opinions of B.D.C.'s teacher, social worker, and father; 2) the ALJ's functional equivalence analysis is not supported by substantial evidence because he failed to evaluate the evidence of record in accordance with the regulations; 3) the AC improperly determined the new evidence was not material even though it showed

---

[4] Again, the ALJ misattributed the teacher's and parents' observations. *See* footnote 3, *supra*.

a continuation of B.D.C.'s impairments in spite of the ALJ's assertion that his impairments were controlled with medication; and 4) this case was adjudicated by an improper and unconstitutionally appointed ALJ and should be remanded for a new hearing with a different and constitutionally appointed ALJ.

As for Billy's last argument that this case was adjudicated by an improper and unconstitutionally appointed ALJ such that he requests remand for a new hearing in front of a different and constitutionally appointed ALJ, it is unnecessary for the Court to reach that argument. The Court recommends remand due to the AC's error, as discussed below. Billy acknowledges in his brief that on July 16, 2018 then Acting Commissioner Nancy Berryhill approved all appointments as her own.[5]

### A

Billy argues that it was error for the Court to determine that B.D.C.'s disciplinary report dated October 25, 2012 through February 21, 2017 was not material, and that determination is subject to judicial review. The Commissioner counters that the AC complied with the regulations in reviewing the evidence Billy submitted and reasonably exercised its discretion in denying review of the ALJ's Decision. The Commissioner provides a somewhat lengthy discussion about the revised, current versions of 20 C.F.R. § 404.970 and 20 C.F.R. § 416.1470 which, as the Commissioner explains, governs AC review and the submission of additional evidence to the AC.

---

[5] Billy states in a footnote "it *appears* that all ALJs at SSA *may* remain unconstitutionally appointed" because "not clear whether an Acting Commissioner has the authority as head of the agency to appoint inferior officers" and "at the time of the appointment by Ms. Berryhill, her service as Acting Commissioner was in violation of the Federal Vacancies Reform Act of 1998." (Doc. 14 at pg. 24), at n.5 (emphasis added). The Court will not entertain such an underdeveloped argument which itself was presented as nothing more than a suggestion. *See U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived")

The Commissioner argues had the AC determined the report to be non-qualifying under the revised regulation, it would have categorized the evidence differently; it would have categorized it as it did the CVS pharmacy prescription which the AC determined was not time-relevant. The Commissioner says the AC's notice in this case "plainly states" the AC found the report "qualifying (new, time-relevant, and material) but that the 10-page disciplinary report 'does not show a reasonable probability that it would change the outcome of the decision'[]." (Doc. 17 at pg. 10). The Notice does *not* "plainly state" the AC found the report qualifying. *See* AR 2. A district court in this Circuit recently observed that "District courts within this circuit have differed over whether review is available, under the revised regulation, when the AC uses [the language that 'the evidence did not show a reasonable probability that it would change the outcome of the decision'] in the denial order." *Musonera v. Saul*, No. 18-C-1852, 2019 WL 5152890, at *4 (E.D. Wis. Oct. 15, 2019). The Court agrees with the reasoning in *Steven D. A. v. Commissioner of Social Security* in which the court decided that the cases discussing the old version of § 404.970[6] "appear to still be applicable under the current version of the regulation. The new regulation does not make a substantive change, but simply incorporates the Seventh Circuit's understanding of materiality[.]" No. 17-cv-819, 2018 WL 3438856, at *7 (S.D. Ill. July 17, 2018); *see also Musonera*, 2019 WL 5152890, at *5 (noting the language used – "the evidence did not show a reasonable probability that it would change the outcome of the decision" – simply restates the Seventh Circuit's definition of the term "material" and "thus provides little help in discerning the basis for denial"). Under the previous version of § 404.970, the Seventh Circuit Court of Appeals made clear that a court retains jurisdiction to review for legal error the AC's conclusion that

---

[6] Its counterpart for SSI claims is found at the previous version of 20 C.F.R. § 416.1470.

13

newly submitted evidence is "non-qualifying," not new and material. *Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015). Here, the Commissioner fails to acknowledge that the redundancy in the language used by the AC opens its determination up to judicial review.

As additional support for the Court's conclusion that the AC rejected the disciplinary report as non-qualifying is the fact that the AC's Notice provides, "We did not exhibit this evidence." *See* HALLEX I-3-5-20 ("If the analyst recommends that the AC deny the request for review and the AC will not consider additional evidence the claimant submitted, the analyst will prepare a denial notice and, as applicable, will . . . Not exhibit the evidence").

Billy argues the 10-page disciplinary report provides evidence in direct opposition to the ALJ's repeated determination that B.D.C.'s impairments were controlled through the usage of medication. Billy is correct. As addressed in Section III, *supra*, the ALJ placed considerable emphasis upon the treatment records which provided that B.D.C.'s parents' and teachers' commented alike that B.D.C.'s behavior was improved on his medication. The ALJ recited those records in support of his determination that B.D.C. had less than marked limitation in acquiring and using information and less than marked limitation in interacting and relating with others. The ALJ also relied upon those records in placing more weight on State Agency Dr. Pittman's analysis of B.D.C. than on B.D.C.'s teacher Dr. Belcher's and social worker Joseph's opinions. Further, the ALJ gave reduced weight to Billy's statements as to his son's level of impairment, in part, because not corroborated by the objective record which included those treatment records.

The 10-page disciplinary report detailed instances of B.D.C.'s misbehavior during the very same time the ALJ had determined B.D.C.'s behavior was *improved* with medication so as to preclude finding that he was markedly limited in more than just one functional domain. For instance, between July 2014 and December

2014 alone, there were fifteen notations in B.D.C.s' disciplinary report. On September 19, 2014, B.D.C. engaged in a fight with another student and had been antagonizing several other students before he fought that student. On October 16, 2014, he stuck a student with a push pin and chased another student around the classroom attempting to stick him. Upon the adult obtaining the pin from B.D.C., B.D.C. punched the adult in the arm. On October 23, 2014, B.D.C. refused to return to the classroom and remained in the hallway running up and down, and upon his return to the classroom he was disruptive and yelling at students and the teacher. On November 12, 2014, B.D.C. continually jumped on the table during reading intervention, tried to start a fight with another student, stuck his middle finger up to the student's face, knocked things down on the desk, and pushed another student. On December 4, 2014, just two weeks before the late December appointment the ALJ highlighted in his Decision to show B.D.C.'s behavior was reported as improved on medication, B.D.C. repeatedly swung his bookbag at students after being directed by the teacher to stop and purposely hit another student in the face with it.

On March 15, 2016, B.D.C. went AWOL from the classroom, made noise and bothered peers, started yelling at staff and peers, kicked his desk, made noises and yelled out to bother his peers and interrupt the lesson, started shoving the disciplinary officer, and his mother came to the school to sit with him for a period of time. On May 11, 2016, B.D.C. screamed, made noise, kicked and scooted a desk around. He, among other things, refused direction, growled, laughed, instigated peers, yelled at staff and broke pencils, kicked a wall and door, and punched a window. On November 1, 2016, B.D.C. verbally abused students and physically assaulted a student. On January 20, 2017, B.D.C. failed to remain seated, bothered others, and physically assaulted a student. On February 21, 2017, B.D.C. attempted to lick the teacher's face, he was redirected verbally multiple times, he

was held back by his wrists, and he again attempted to lick the teacher's face. B.D.C. was taken to a safe room upon another adult assisting the teacher. Upon his release into the safe room, B.D.C. swung and punched a male adult five times in the chest and abdomen.

The incidents detailed in that report, specifically those dated in 2014, 2016, and 2017 call into serious question the accuracy of the ALJ's finding that B.D.C.'s behavior improved on medication which contributed to the ALJ's ultimate finding that B.D.C. was not disabled. Given the ALJ's overt reliance upon the evidence of B.D.C.'s improvement on medication standing alone and his reliance upon such evidence to reject *other* evidence as to B.D.C.'s level of impairment, this new evidence creates a reasonable probability that the Commissioner would have reached a different conclusion had the disciplinary report been considered. The Court therefore recommends that this matter be remanded to the agency for further proceedings.

### B

The Court further recommends that if this case is remanded for the reasons set forth above, the agency revisit the weight given the opinions of record and ensure that the record evidence is evaluated in accordance with the applicable regulations. Such issues were clearly intertwined with the ALJ's reliance upon B.D.C.'s improvement upon medication.

### V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 13) be granted; 2) the Defendant's Motion for Summary Affirmance (Doc. 16) be denied; and 3) this case be remanded to the Commissioner of Social Security for further proceedings consistent with this Report & Recommendation Pursuant to 42 U.S.C. §405(g), Sentence Four.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended*.

Entered on October 29, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE